USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-2149

 ALFRED HASENFUS and GALE HASENFUS,
 INDIVIDUALLY and o/b/o JAMIE HASENFUS,

 Plaintiffs, Appellants,

 v.

 L. ROGER LaJEUNESSE, ET AL.,

 Defendants, Appellees.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MAINE

 [Hon. Morton A. Brody, U.S. District Judge]

 Before

 Selya, Boudin and Stahl,
 
 Circuit Judges.
 
 
 
 Tracie L. Adamson with whom Susan V. Wallace, Sumner H.
Lipman, Robert J. Stolt, and Lipman & Katz, P.A. were on brief for
appellants.
 Deirdre M. Smith with whom Melissa A. Hewey and Drummond
Woodsum & MacMahon were on brief for appellees L. Roger LaJeunesse,
Paul Knowles, Carlo Kempton and Winthrop Board of Education.
 Edward R. Benjamin, Jr. with whom Thompson & Bowie was on
brief for appellee Town of Winthrop.
 

April 29, 1999

 
 
 BOUDIN, Circuit Judge. This is an appeal from the
district court's dismissal of a complaint filed by Alfred and Gale
Hasenfus, on behalf of themselves and their minor child Jamie
Hasenfus, arising out of Jamie's attempted suicide at school. The
complaint set forth claims under 42 U.S.C. 1983 and state law
against the Town of Winthrop, Maine, and others. The facts alleged
in the complaint are as follows.
 In the spring of 1996, Jamie was a 14-year-old student in
the 8th grade of the Winthrop Middle School. On May 2 of that
year, Jamie was reprimanded by her teacher, Carlo Kempton, for
misconduct during a physical education class on the school softball
field. Kempton told Jamie to return to the locker room. No one
from the school staff was supervising the locker room. After
returning to the locker room, Jamie tried to hang herself. 
Classmates found Jamie and called for emergency help. Jamie
survived but, at first in a coma, spent several weeks in the
hospital and was left with permanent impairments. 
 The complaint describes two other incidents as background
to the attempted suicide. One was that Jamie had been raped when
she was 13 and later underwent the further trauma of testifying
against the rapist. School officials were aware of the rape. 
Jamie had reported it to the school nurse, Jackie Kempton (wife of
the gym teacher, Carlo Kempton), and was later counseled by the
school nurse and school guidance counselor. According to the
complaint, Carlo Kempton knew or should have known of the rape and
should not have sent Jamie "alone and unsupervised away from the
area he was monitoring when he knew or should reasonably have known
that she was despondent or distressed." 
 The other background event was that seven other students
in the Winthrop Middle School had also attempted suicide in the
three months prior to May 1996. Several of those attempts had
occurred at school or school events, and Jamie apparently knew or
was associated with at least two of those students. According to
the complaint, the school failed to take various possible measures
to cope with the epidemic, such as offering special counseling and
monitoring programs within the school and providing more
information to parents about the outbreak.
 On April 30, 1998, just short of two years after Jamie's
suicide attempt, the Hasenfus parents brought suit in the district
court on behalf of Jamie and themselves. The defendants, in
addition to the town and its board of education, included three
individuals: the superintendent of schools, the principal of
Jamie's school, and the gym teacher (Carlo Kempton). The counts
with which we are centrally concerned were based upon section 1983;
they charged that specific acts and omissions by defendants acting
under color of state law deprived Jamie of her Fourteenth Amendment
rights, including, inter alia, rights to life and physical safety. 
The parents alleged the infringement of their right to family
integrity. 
 The gist of the wrongful acts charged to the town, school
board, superintendent, and principal were the failure to take a
range of preventive actions listed in the complaint to cope with
the suicide epidemic and, specifically as to Jamie, three narrower
failures or mistakes discussed at the end of this opinion. Carlo
Kempton's alleged wrongful acts were reprimanding Jamie in front of
her classmates and sending her alone to the locker room. The same
facts were alleged as violations of the Maine Constitution and as
common law torts of negligence and negligent infliction of
emotional distress.
 The defendants moved to dismiss the section 1983 counts
for failure to state a claim, Fed. R. Civ. P. 12(b)(6), and asked
that the state claims then be dismissed for lack of federal
jurisdiction, Wagner v. Devine, 122 F.3d 53, 57-58 (1st Cir. 1997),
cert. denied, 118 S. Ct. 880 (1998). The magistrate judge
recommended this course (with one variation irrelevant here), and
the district court thereafter approved the recommendation. This
appeal followed. On review, we take the factual allegations of the
complaint as true, drawing reasonable inferences in favor of the
plaintiffs. Garita Hotel L.P. v. Ponce Fed. Bank, FSB, 958 F.2d
15, 17 (1st Cir. 1992).
 The central question for us on this appeal is whether the 
conduct attributed to the defendants violates the federal
Constitution so far as it protects against state action depriving
one of life or liberty without "due process of law." The most
familiar dimension of due process is protection of procedural
rights, but the due process concept has been extended by the
Supreme Court to incorporate substantive protections. See
Washington v. Glucksberg, 117 S. Ct. 2258, 2267 (1997). These
include not only a selected set taken from the Bill of Rights but
also a generalized protection sometimes labeled "substantive due
process." Nowak and Rotunda, Constitutional Law 11.3-11.4, at
374-93 (5th ed. 1995).
 In the district court and in their opening brief on
appeal, the Hasenfuses argued forcefully that--contrary to the
district court's view--the school had an affirmative duty to
protect Jamie as a student entrusted to its care. In their reply
brief, the Hasenfuses suddenly purport to abandon reliance on this
theory, saying that they prefer to concentrate their appeal on
Kempton's alleged danger-creating conduct. But elsewhere the reply
brief itself returns to the allegation that school officials acted
recklessly "by standing by throughout the suicide epidemic and
doing nothing to identify at-risk students or to train personnel to
effectively deal with these students at risk."
 In the complaint, the principal conduct charged against
the defendants--apart from Kempton--was their failure to take
measures to cope with the rash of attempted suicides at the school. 
Under common law, inaction rarely gives rise to liability unless
some special duty of care exists. Restatement (Second) of Torts 
314 & cmt. a (1965). In DeShaney v. Winnebago County, 489 U.S. 189
(1989), the Supreme Court took the same view of substantive due
process obligations, holding that ordinarily a state's failure to
intervene to prevent harm to an individual by a private actor is
not a constitutional violation.
 The main exceptions to this proposition are incarcerated
prisoners or involuntarily committed mental patients for whom a set
of unique rules has developed. See Estelle v. Gamble, 429 U.S. 97
(1976); Youngberg v. Romeo, 457 U.S. 307 (1982). In such cases,
failures to act--e.g., to provide medical care or to stop one
inmate from assaulting another--may comprise a due process or other
constitutional violation because the state-imposed circumstance of
confinement prevents such individuals from helping themselves. 
Liability then arises under section 1983 if the plaintiff shows
that the inaction was malicious or reflected the official's
"deliberate indifference" to the welfare of the prisoner or
inmate. Farmer v. Brennan, 511 U.S. 825, 837 (1994).
 The plaintiffs urge that Jamie is similar to the
prisoners and patients because school attendance is compulsory and
because in some measure the school authorities act in loco
parentis. The circuits that have confronted this issue have
uniformly rejected this argument, holding that school children are
not captives of the school authorities and the basic responsibility
for their care remains with their parents. The Hasenfuses'
position is especially difficult to accept outright since the
Supreme Court has come pretty close to rejecting it in a recent
dictum which specifically contrasted DeShaney:
 [W]e do not, of course, suggest that public
 schools as a general matter have such a degree
 of control over children as to give rise to a 
 constitutional "duty to protect."
 
Vernonia Sch. Dist. v. Acton, 515 U.S. 646, 655 (1995). See also
Wyke, 129 F.3d at 569.
 Nevertheless, we are loath to conclude now and forever
that inaction by a school toward a pupil could never give rise to
a due process violation. From a commonsense vantage, Jamie is not
just like a prisoner in custody who may be owed broad (but far from
absolute) "duty to protect." But neither is she just like the
young child in DeShaney who was at home in his father's custody and
merely subject to visits by busy social workers who neglected to
intervene. For limited purposes and for a portion of the day,
students are entrusted by their parents to control and supervision
of teachers in situations where--at least as to very young
children--they are manifestly unable to look after themselves.
 Thus, when Vernonia says that the schools do not "as a
general matter" have a constitutional "duty to protect," perhaps in
narrow circumstances there might be a "specific" duty. If Jamie
had suffered a heart attack in the classroom, and the teacher knew
of her peril, could the teacher merely leave her there to die
without summoning help? If a six-year old child fell down an
elevator shaft, could the school principal ignore the matter? Of
course, school officials might be held liable in tort for such
omissions, but common law liability aside, we hesitate to say for
certain that substantive due process plays no role.
 Yet even if we assume arguendo that in narrow
circumstances the Supreme Court might find a due process obligation
of the school or school employees to render aid to a student in
peril--and Vernonia invites some caution--it would require pungent
facts. The basic due process constraint, where substance and not
procedure is involved, is against behavior so extreme as to "shock
the conscience." County of Sacramento v. Lewis, 118 S. Ct. 1708,
1717-19 (1998); Rochin v. People of California, 342 U.S. 165, 172
(1952). Outside of a few narrow categories, like the safeguarding
of prisoners who have been wholly disabled from self-protection,
this means conduct that is truly outrageous, uncivilized, and
intolerable. Lewis, 118 S. Ct. at 1717.
 The Supreme Court has regularly cited Rochin's test with
approval, see Lewis, 118 S. Ct. at 1717 (citing cases), but has
almost never found it to be violated even where the state has
affirmatively caused the harm. The few circuit cases that have
found or posited possible liability under a shock-the-conscience
rubric since Rochin have usually involved egregious facts. E.g.,
Rogers v. City of Little Rock, 152 F.3d 790 (8th Cir. 1998) (rape
by police officer in connection with car stop); Armstrong v.
Squadrito, 152 F.3d 564 (7th Cir. 1998) (57-day unlawful detention
despite repeated requests). The omissions charged against the
school authorities here are not even close to violating this
outrageousness standard.
 The outcome here would be no different under the more
plaintiff-friendly standard developed in prison cases. Even under
this standard, courts have been very reluctant to find prison
guards liable for failing to prevent suicides unless confronted
with specific imminent threats. E.g., Bowen v. City of Manchester,
966 F.2d 13, 16-18 (1st Cir. 1992); Manarite v. City of
Springfield, 957 F.2d 953 (1st Cir.), cert. denied, 506 U.S. 837
(1992). The Supreme Court has recently equated "deliberate
indifference" in prison cases with criminal recklessness, Farmer,
511 U.S. at 837-39, which is certainly not present here. Further,
in Lewis the court declined to employ a deliberate indifference
standard at all in a non-prison case where the situation involved
a complicated balancing of factors and choices rather than a clear
right or wrong answer. Lewis, 118 S. Ct. at 1720.
 Attempted suicide by school-age children is no slight
matter; but it has no single cause and no infallible solution. 
See Governor's Task Force on Adolescent Suicide & Self-Destructive
Behaviors, Adolescent Suicide 42-61 (1996). Different schools will
react differently, depending upon resources, available information,
and the judgment of school and public health authorities, who may
fear making a bad situation worse. Absent a showing that the
school affirmatively caused a suicide, the primary responsibility
for safeguarding children from this danger, as from most others, is
that of their parents; and even they, with direct control and
intimate knowledge, are often helpless. Possibly there was school
negligence here--one would need more information to make a
judgment--but negligence is not a due process violation. Daniels
v. Williams, 474 U.S. 327, 332-33 (1986).
 We turn now from the charge of inaction made against the
town and other school officials to the claims against Carlo Kempton
that do charge him with affirmative acts, specifically, the public
reprimand of Jamie and her banishment to the unsupervised locker
room. Here, DeShaney does not even arguably foreclose liability
which is presumably why this issue is stressed in the reply brief.
Where a state official acts so as to create or even markedly
increase a risk, due process constraints may exist, even if
inaction alone would raise no constitutional concern. But once
again, the behavior must be conscience-shocking or outrageous. See
Lewis, 118 S. Ct. at 1717-19.
 Kempton reprimanded a 14-year-old student for misbehavior
and sent her out of class, something that occurs pretty regularly
at schools across the country. For the first time at oral
argument, plaintiffs' counsel described the circumstances of
Jamie's dismissal from the gym class. Counsel said that several of
Jamie's classmates had been harassing Jamie about the rape she had
suffered and about her decision to testify against the perpetrator. 
In response to the harassment on this occasion, Jamie became highly
agitated, shouting obscenities and threatening unspecified acts of
violence against those around her.
 On appeal, the granting of a motion to dismiss is tested
against the factual allegations in the complaint. Gooley v. Mobil
Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988). Even if these
additional facts had been mentioned in the complaint--and they were
not--it is not alleged that Jamie threatened to kill herself then
or at any other time known to Kempton. At most, he may have known
that she had suffered a rape a year before and that some other
students at the school had attempted suicide. It would be hard to
wrest even a claim of negligence out of these facts. To say that
Kempton acted maliciously to cause harm to Jamie, or otherwise
acted in a way that should shock the conscience, is not a remotely
plausible interpretation of the facts alleged in the complaint and
at oral argument.
 Only one circuit case cited to us has found a triable
issue on anything remotely like these facts and its own facts were
more aggravated. In Armijo, 159 F.3d 1253, school officials sent
home a 16-year-old special education student for violent behavior
at school. The student had earlier threatened to kill himself and,
contrary to school policy, the officials did not notify his parents
that he had been sent home, where the student had access to
firearms--a fact school officials were alleged to have known. 
Alone at home, the student shot himself. His parents then sued,
alleging inter alia a substantive due process claim, and the case
went to the Tenth Circuit on an interlocutory appeal. 
 The Tenth Circuit held that DeShaney barred any
affirmative duty to protect based on a "custodial relationship"
between student and school. Armijo, 159 F.3d at 1261-62. But the
court also said liability might be based on the school's
affirmative act--sending the student home alone--if it increased
the danger to the child and also met the "shocks-the-conscience"
test. Id. at 1262. The court said that the latter test might be
met if at trial the school officials were also shown to have known
that the child in question had previously threatened suicide, was
now distraught, was a special education pupil not fully able to
care for himself, and had access at home to firearms. Id. at 1263-
64.
 Whether or not one agrees with the Tenth Circuit that
such behavior would be conscience-shocking and not merely seriously
negligent, the assumed facts are at least very troubling,
especially as to any participating official who knew both of the
suicide threat and the available gun. Even so, the facts in that
case go a step beyond the typical endangerment cases cited by the
Tenth Circuit, cases that involve manifestly outrageous behavior by
the authorities certain to cause harm. See Dwares, 985 F.2d at 96
(police encourage skinheads to beat up flag-burning demonstrators);
Ross, 910 F.2d at 1429-34 (deliberate state interference with
private rescue attempt). If sound, the Tenth Circuit decision is
at the outer limit, and does not come close to embracing Kempton's
actions.
 Three other alleged mistakes are all attributed to the
school authorities in the complaint apart from their failure to
prevent Jamie's suicide attempt. Two of the three--the failure to
discover Jamie in timely fashion and the failure to act reasonably
and appropriately when she was discovered--are bare conclusions and
are not supported by any factual allegations in the complaint or
elsewhere in the district court. DM Research v. College of
American Pathologists, 1999 WL 104446 *2-3, to be reported at 170
F.3d 53 (1st Cir. 1999). The third claim, that the school told
other parents that Jamie had attempted suicide, is not a due
process violation. Cf. Paul v. Davis, 424 U.S. 693, 711-12 (1976).
 In closing, we emphasize again that the due process
clause is not a surrogate for local tort law or state statutory and
administrative remedies. The federal courts have no general
authority to decide when school administrators should introduce
suicide prevention programs, or whether an unruly or upset school
child should be sent out of class, or what should be said to other
parents about a tragic incident at school. Substantive due process
is not a license for judges to supersede the decisions of local
officials and elected legislators on such matters. Cf. Collins v.
City of Harker Heights, 503 U.S. 115, 128-29 (1992). 
 In principle, Maine law does allow civil claims by
citizens for serious misconduct by state or local officials, and
the district court's dismissal in this case was without prejudice
to the assertion of the Hasenfuses' state claims in state court. 
As is quite common, Maine provides broad immunity protection for
its officials, Me. Rev. Stat. Ann. tit. 14, 8104-D, 8111, grants
governmental entities immunity from civil suit with certain
exceptions possibly not applicable here, id. 8103, 8104-A, and
places a monetary cap on the amount of damages available against
individual employees and the government itself, id. 8104-D,
8105. Whether Maine should be more generous is a matter for its
citizens to decide.
 Affirmed.